IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HIGHWAY COMMERCIAL SERVICES, INC.,   )
  )
                        Plaintiff,   )   No. 08 CV 3445
  )
                        v.   )   Magistrate Judge Michael T. Mason
  )
MIDWEST TRAILER REPAIR, INC.,   )
  )
                        Defendant.   )

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge.

This is an action for breach of contract and associated or alternative claims brought by plaintiff Highway Commercial Services, Inc. ("Highway Commercial") against defendant Midwest Trailer Repair, Inc. ("Midwest Trailer"). Highway Commercial's claims arise out of an alleged agreement for it to purchase certain semi-trailers owned by Midwest Trailer and subject to individual lease agreements between Midwest Trailer and FreightStar Landlines, Inc. ("FreightStar"), a third party. Highway Commercial contends that, upon purchase of those trailers, it would become the lessor of those trailers to FreightStar instead of Midwest Trailer. Highway Commercial argues Midwest Trailer agreed to re-title the trailers at Highway Commercial's direction, or otherwise had a legal duty to protect its interest in the trailers.

For its part, Midwest Trailer denies that it ever had any duty to re-title the trailers in Highway Commercial's name, or to list the first lien holder on the titles. After receiving the purchase price for the trailers, Midwest Trailer re-titled the trailers in the name of FreightStar. Thereafter, FreightStar pledged the trailers as collateral on a loan

1

to third party Plaza Bank.  Plaza Bank repossessed the trailers, sold some of them, and applied the sale proceeds to the unpaid balance due on its loan to FreightStar. Ultimately, FreightStar ceased doing business and its owner Michael Zitis filed a petition for bankruptcy.

This Court conducted and concluded a bench trial on November 17, 2010.  The Court has considered the testimony of the witnesses who testified at the trial, the deposition excerpts of the witnesses who were not called to testify in person, the parties' trial exhibits, the stipulations made by the parties, and the parties' post-trial briefs [97, 99, 102, & 104].  The Court weighed the testimony of each witness and determined whether the testimony was truthful and accurate (in part, in whole, or not at all) and decided what weight, if any, to give to the testimony of each witness.  In making this determination, we considered, among other things: the ability and opportunity of the witness to see, hear, or know the things about which the witness testified; the witness's memory; any interest, bias, or prejudice the witness may have; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all of the evidence in the case.  *See* Fed. Civ. Jury Instr. 7th Cir. § 1.13 (2009).

For the reasons stated below, the Court finds that Highway Commercial is entitled to prevail on its claims for breach of contract and breach of duty by bailee, finds that Highway Commercial is entitled to damages in the amount of $105,542.50, and denies Midwest Trailer's oral motion for a directed verdict.  The following constitute the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the

Federal Rules of Civil Procedure.[1]

## I.     FINDINGS OF FACT

Plaintiff Highway Commercial is an Ohio Corporation, with its principal place of business located in Columbus, Franklin County, Ohio.  (Joint Stipulations ¶ 1.)[2] Highway Commercial engages in the business of leasing tractors and semi-trailers.  (*Id.*) Highway Commercial is owned by Fyda Freightliner Columbus, Inc. ("Fyda"), a parent company that owns a total of five freightliner dealerships throughout Ohio and Pennsylvania.  (Tr. 29.)

Defendant Midwest Trailer is an Illinois Corporation with its principal place of business located in Chicago, Cook County, Illinois.  (Joint Stipulations ¶ 2.)  Midwest Trailer is in the business of selling, repairing, and leasing semi-trailers.  (*Id.*)

FreightStar was an interstate trucking company incorporated in the State of Illinois.  (Joint Stipulations ¶ 3.)  FreightStar no longer operates. (*Id.*)

Michael Zitis, a resident of Cook County, Illinois, owned and operated FreightStar.  (Joint Stipulations ¶ 4.)  Zitis filed a Chapter 7 Bankruptcy case in 2008 and received a discharge. (*Id.*)

---

[1]  To the extent certain findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law.  Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings of fact.

[2]  References to "Joint Stipulations ¶ __" are to the parties' joint statement of uncontested facts, which the parties attached to their proposed Final Pretrial Order.  References to "Tr. __" are to the Transcript of Proceedings in this case.  References to "__ Dep." are to designations in deposition transcripts submitted to this Court.  References to "PX __" and "DX __" are to plaintiff's and defendant's trial exhibits, respectively.  References to "[__]" are to docket entries. We have provided selected citations to the factual findings.  They are intended to be representative citations and there may be other factual support in the record not specifically cited.

At trial, Robert Tannenbaum, Midwest Trailer's President and majority owner, testified that Midwest Trailer began doing business with Zitis in early 2005. (Tr. 193.) Tannenbaum testified that Zitis wanted to buy trailers, but initially did not have the financing to do so, so he decided to lease trailers. (*Id.*) FreightStar originally leased each of the trailers at issue in this case from Midwest Trailer. (Joint Stipulations ¶ 5.) At all relevant times prior to December 9, 2005, all of the trailers at issue in this case were in the possession of Mike Zitis and FreightStar. (Joint Stipulations ¶ 6.) FreightStar fell behind in rental payments on the trailers rented from Midwest Trailer and still owes Midwest Trailer substantial sums of money. (Joint Stipulations ¶ 7.) Robert Tannenbaum testified that, during the relevant time period, when Midwest Trailer called Zitis for money, Zitis said he wanted to buy the trailers and was working on securing financing. (Tr. 193.) Tannenbaum testified that he was "okay with that" so long as Zitis actually went through with buying the trailers. (*Id.*)

At trial, Robert Tannenbaum testified that Zitis was working with Joshua Tannenbaum, Mr. Tannenbaum's son, who is also employed by, and is a 20% owner of, Midwest Trailer. (Tr. 197.) While his testimony is by no means clear on the issue, it also appears that Robert Tannenbaum was not personally aware of any of Midwest Trailer's dealings with Zitis or Highway Commercial in December 2005, as he stated: "I didn't even know about this in December of 2005 .... Mr. Zitis was working with Josh, okay, and, you know, what I testified to is what actually, you know, Josh told me." (Tr. 197-98; see also Tr. 210.) Neither party called Joshua Tannenbaum to testify at trial, although both submitted excerpts of his deposition for this Court's review. During his deposition, Joshua Tannenbaum stated that he negotiated the "sale" of the trailers to

4

Zitis.  (J. Tannenbaum Dep. 99.)

On or about September 30, 2005, Highway Commercial entered into a purported Master Vehicle Lease Agreement with Zitis, pursuant to the terms of which Highway Commercial agreed to lease certain trailers to Zitis, and Zitis agreed to lease certain trailers from Highway Commercial (the "Master Lease").  (Joint Stipulations ¶ 8; PX 1.) The trailers were identified in a schedule attached to the Master Lease and dated December 20, 2005.  (Joint Stipulations ¶ 9.)  The eight semi-trailers at issue in this lawsuit were listed on the December 20, 2005 lease schedule and bore the following vehicle identification numbers: 1GRAA06295T512037, 1GRAA06205T512038, 1DW1A53205B755456, 1DW1A53215S759144, 1GRAA06295T512040, 1GRAA06225T512039, 1GRAA06205T512041, and 1DW1A53235S759145.  (Joint Stipulations ¶ 10.)

The Master Lease between Highway Commercial and Zitis was a so-called TRAC Lease, which is a tax-advantaged lease arrangement whereby the vehicles are owned by the lessor and leased by the lessee with a specified "buyout" at the end of the lease term. (Joint Stipulations ¶ 11.) At the end of the lease term, the lessee would be entitled to purchase the vehicles by payment of the "buyout" amount, upon which the lessor would provide title to the vehicle or vehicles to the lessee. (*Id.*)  The TRAC leases between Highway Commercial and FreightStar call for a security deposit. (*Id.*)

Highway Commercial's President, Kenneth Browning, testified at trial that there are two benefits to using a TRAC lease.  First, because of the tax benefit resulting from using such a lease, the equipment owner can charge the lessee a smaller payment under the lease.  Second, because the owner has title to the equipment, if the lessee

5

goes into bankruptcy, the owner can retrieve its equipment, which stays outside of the bankruptcy court's administration of assets.  (Tr. 31-32.)  At trial, Browning testified he explained the TRAC lease concept to Zitis on multiple occasions.  (Tr. 35-36.)  During his deposition, Zitis volunteered that, "in [his] opinion, [TRAC leases] really shouldn't exist," and that he "thought [his leases with Highway Commercial] were purchases." (Zitis Dep. 58, 42.)[3]

Nicole Byrd (a/k/a Nikki Byrd) is employed by Highway Commercial as a credit manager. (Joint Stipulations ¶ 12.)  In 2005 and 2006, she was an asset administrator employed by Highway Commercial with responsibility for administrative tasks and titles. (*Id.*)  Sindia Varela was the Midwest Trailer employee designated to handle accounts receivable, which included administrative matters regarding sales and title matters for Midwest Trailer.  (Joint Stipulations ¶ 13.)

At trial, Bryd testified that Browning told her about Highway Commercial's agreement with Zitis to finance the purchase of trailers for lease to Zitis.  (Tr. 93.)  She stated that in November or early December, 2005, she contacted Varela by telephone to inform her that Highway Commercial would be wiring money to Midwest Trailers for trailers that Highway Commercial was leasing to Zitis.  (Tr. 94.)  Byrd stated that during that call, she asked Varela for wiring instructions, copies of the titles, and the invoice, and where she (Byrd) could send Varela titling information.  (Tr. 94-95.)  As for the titling information, Byrd testified that Varela agreed Byrd could email her those instructions. (Tr. 99.)

---

[3]  Neither party called Zitis to testify at trial, but both submitted excerpts of his deposition for this Court's review.

On December 9, 2005, Varela faxed to Byrd wire transfer instructions, a bill of sale dated November 1, 2005 setting forth Midwest Trailer's price for each trailer listed, and copies of the trailer titles in question. (Joint Stipulations ¶ 14; *see also* PX 5.)  The trailers listed in that bill of sale are the same ones listed on the December 20, 2005 schedule to Zitis' and Highway Commercial's Master Lease.  (Joint Stipulations ¶ 10; *seel also* PX 5.)  The facsimile's cover sheet states, under "Comments," "Re: Freight Star Mike Zitis." (*Id.*)  The bill of sale listed a price per trailer of $19,950.  (PX 5.)  The bill of sale also included a charge of $920, for "Title and Registration FOR ALL TRAILERS ABOVE." (*Id.*)  Finally, the bill of sale lists "FREIGHT STAR LANDLINES, INC. ATTN. MIKE ZITIS" under the "Bill to" heading.  (*Id.*)  Byrd testified at trial that she never attempted to have the name on the bill of sale changed from FreightStar to Highway Commercial, because to Highway Commercial, that invoice simply indicated not who the purchaser was, but who Highway Commercial's lessee was.  (Tr. 151.)

After receiving that facsimile, Byrd emailed Varela that same day, December 9, 2005.  (PX 7.)  In her email, Byrd thanked Varela for the facsimile, and described how "[t]he titles should read," listing as "OWNER" "Highway Commercial Services, Inc.", as "1st LIENHOLDER" "Fyda, Inc.," and including the following address for both entities: "1250 Walcutt Road, Columbus, OH 43228."  (*Id.*)  Byrd's email also stated "We are set to wire $160,520.00 on 12/20/2005 per the wiring instructions you sent." (*Id.*)

At trial, Byrd testified that she sent her December 9 email two times, first to the address "cindia@midtrailer.com," and then to the address "Sindia@midtrailer.com." (Tr. 96-97; *see also* PXs 7, 6.)  Byrd testified that, after the first transmission of the email was "bounced back" to Byrd as "undeliverable," she called Varela, who gave her the

7

correct spelling of her email address. (Tr. 97-98.) Byrd also testified that the second transmission of her email did not come back to her as undeliverable. (*Id.*)

Additionally, Byrd testified that the normal procedure followed by Highway Commercial and the dealer/seller once Highway Commercial had paid the titling fees and the purchase price would be for the dealer to perfect the titles, that is, for Highway Commercial to be listed as the owner, and for Highway Commercial to receive those titles, either from the seller or the Secretary of State. (Tr. 101, 106.) Byrd stated that she expected to see Highway Commercial listed as the owner on the titles of the trailers purchased from Midwest Trailer when she received them. (Tr. 102.)

For her part, Varela testified at trial that she understood that Highway Commercial was financing FreightStar's purchase of the trailers. (Tr. 164-65.) She stated that as the one providing financing, it was up to Highway Commercial to provide instructions regarding titling. (Tr. 168-69.) As for Byrd's titling instructions, Varela stated she did not recall receiving Byrd's December 9, 2005 email, but that it was the sort of communication she would have expected to receive, as it provided instructions for how the titles should read, and such instructions were necessary whenever a sale was being financed. (Tr. 174-76.) She testified that if she had received titling instructions via email, she would have printed out the email and put it in the file, but did not recall doing so in this case. (Tr. 187.) Joshua Tannenbaum testified during his deposition that Varela was not proficient with email, and that he did not train her in using email. (J. Tannenbaum Dep. 112.)

Shortly before Byrd initially contacted Varela regarding Highway Commercial's financing of the eight trailers on Zitis' behalf, Varela had sent a facsimile to Balboa, a

company located in Arizona.  (PX 3; Tr. 158.)  That fax contained a bill of sale for four trailers dated November 2, 2005, with "Freight Star LandLines" and "ATTN: MIKE ZITIS" listed under "Purchaser."  (PX 3.)  The fax appears to have been originally sent on November 2, 2005, and then resent on December 9, 2005.  (*Id.*)  At trial, Varela testified her recollection that Balboa might have been a financing company, and that FreightStar might have been looking to purchase those trailers with Balboa's assistance.  (Tr. 159.)

On December 20, 2005, Highway Commercial sent and Midwest Trailer received a wire transfer in the amount of $160,520, the amount set forth on the November 1, 2005 bill of sale that Varela had faxed Byrd.  (Joint Stipulations ¶ 15.)  As noted above, Byrd's December 9, 2005 email to Varela stated that Highway Commercial's wire transfer would be sent to Midwest Trailer on that date.  (PX 7.)  Valera testified that she did not recall Midwest Trailer ever having received this wire from Highway Commercial. (Tr. 188.)  Robert Tannenbaum testified that if he had known about that transfer at the time Midwest Commercial received it, he would not have thought it was Zitis' money. (Tr. 210.)  In his deposition, Joshua Tannenbaum testified that he was "under the impression" the money came from FreightStar, because Zitis told him the day the money arrived that FreightStar had paid it.  (J. Tannenbaum Dep. 93.)

Approximately three weeks later, on January 14, 2006, Byrd sent another email to Varela at "Sindia@midtrailer.com."  That email read: "Hi Sindia:  I was just checking up on the titles for the 8 trailers that we financed for Mike Zitis dba Freight Star.  Let me know if there is anything else I need to do.  Thanks, Nikki."  (PX 8.)  That email was not returned as undeliverable to Byrd.  (Tr. 103.)  Byrd received no response to that email. (*Id.*)

At trial, Varela testified that she had left her employment with Midwest Trailer in early January 2006, and was no longer working for Midwest Trailer on January 14. (Tr. 170, 185-86.) After giving notice, Varela was tasked with training her replacement, Jeanette Gradford.[4] (Tr. 169.) Varela testified that she did not think her replacement was capable of handling her job "at first," and did not recall that her replacement was knowledgeable about the trailer business.[5] (Tr. 170.) Varela also stated that after she left, Joshua Tannenbaum took over and worked at Midwest Trailer with Gradford. (Tr. 170.) Varela testified that she recalled that the titles for the eight trailers purchased in December 2005 were still physically located at Midwest Trailer when she left that company's employ in January 2006. (Tr. 182-83.) She also testified that she did not handle the actual titling of the trailers from that purchase, but left that task for her replacement. (Tr. 186.) Finally, Valera testified that usually when an employee left Midwest Trailer, his or her emails "were all forwarded to Josh Tannenbaum," including any emails on Varela's machine. (Tr. 188.)

Byrd testified that, after receiving no response to her January 2006 email to Varela, she called Midwest Trailer and learned for the first time that Varela no longer worked there. (Tr. 104.) Bryd testified that she spoke with a person named Jeanette,

---

[4] The Transcript of Proceedings spells the last name of Varela's replacement "Gragford" (Tr. 169), but an affidavit signed by Joshua Tannenbaum, another owner of Midwest Trailer, and submitted in connection with the parties' summary judgment briefing spells that name "Gradford" [62-2]. We assume that both reference the same person. We also note that Gradford was not deposed or called to testify at trial, apparently because neither party could locate her. (Tr. 211.)

[5] For his part, Robert Tannenbaum testified that Gradford was an "okay" employee and the "only problem" was that she "came in late a little bit." (Tr. 220.) Joshua Tannenbaum testified that there were no problems with Gradford's job performance, other than her "not showing up to work." (J. Tannenbaum Dep. 16.)

who asked that Byrd send over titling instructions, and gave Byrd her email address. (Tr. 105.) On February 13, 2006, Byrd emailed Jeanette with those instructions. Byrd's email read, "Jeanette: The titles for Freight Star (Mike Zitis) should read as follows," listed as "OWNER" "Highway Commercial Services, Inc.", as "LIENHOLDER" "Fyda, Inc.", and expressly noted it included the same address for both entities: "1250 Walcutt Road, Columbus, OH 43228." (PX 9.) During his deposition, Joshua Tannenbaum stated that Gradford "possibly" used email while she was employed at Midwest Trailer and that he "kn[o]w[s] for a fact that she sent [him] an email or two" while she was employed there. (J. Tannenbaum Dep. 111.)[6]

Shortly after sending her email to Gradford, Byrd testified that she followed up by calling Gradford, who told Byrd that the titling issues "had been taken care of." (Tr. 106, 107.) Byrd testified she understood that to mean that Gradford had submitted the titles to the Secretary of State of Illinois, and that Byrd would receive perfected titles. (*Id.*) Byrd testified that thereafter, and until September 2007, she did not have any further communications with Midwest Trailer regarding the titles to the trailers from the December 2005 transaction. (Tr. 118, 120-121.) She stated that at some point in that time period, she was made aware those titles were in Zitis' physical possession, but that she was not aware that those titles were in his name. (Tr. 118, 148.) She stated that, at that point in time, she was under the impression that the titles were under Highway Commercial's name, as per her instructions to Midwest Trailer. (Tr. 148-49.) She testified that, because some states require an in-state address for titling purposes, "it

---

[6] As noted above, Gradford was not deposed or called to testify at trial.

wouldn't have been odd to [her] that Mr. Zitis had to use his address to get the titling done." (Tr. 148.) She testified that, given the amount of money involved in Highway Commercial's portfolio with Zitis, as well as its relationship with him and the fact that he was moving offices, Highway Commercial had no reason to believe that the titles were incorrect, or to push Zitis to give physical possession of the titles to Highway Commercial. (Tr. 130-31, 150.)

On March 14, 2006, the titles for the semi-trailers listed on the November 1, 2005 bill of sale were submitted to the Illinois Secretary of State with FreightStar listed as the owner. (Joint Stipulations ¶ 17.) The ST-556 Sales Tax Transaction forms dated February 1, 2006 bore the signature "Mike Zitas" [sic]. (*Id.*; *see also* PX 13.) The parties' stipulations do not indicate who precisely submitted the forms to the Illinois Secretary of State's Office, although the parties' "Brief Statement of the Case" portion of the Final Pretrial Order [106] indicates that Midwest Trailer did so. Joshua Tannenbaum testified during his deposition that the "administrative person" at Midwest Trailer was responsible for preparing title applications and sending them to the Illinois Secretary of State's Office. (J. Tannenbaum Dep. 78-79.) According to Tannenbaum, in late 2005 and early 2006, that person would have been Varela or Gradford. (*Id.*) He also stated that the applications are signed by the preparer and the "purchaser," and that no one besides the person who completed the applications reviewed them. (*Id.*) For his part, Zitis testified in his deposition that he did not sign the forms, and that he received "new titles in the name of FreightStar" in the mail. (Zitis Dep. 88-89, 95.)

In April 2006, Highway Commercial agreed to finance Zitis' lease of another nine trailers from Midwest Trailer. (PX 1.) To do so, Highway Commercial and Zitis

executed another schedule identifying the additional trailers, dated April 10, 2006, and attached it to the September 2005 Master Lease, as per Highway Commercial's usual practice. (PX 1; Tr. 34.) Byrd testified that she spoke, by telephone, with someone at Midwest Trailer in April 2006 regarding Highway Commercial's financing of these additional trailers. (Tr. 123.) On April 11, 2006, Highway Commercial sent and Midwest Trailer received a wire transfer in the amount of $160,520. (Joint Stipulations ¶ 16.) This amount represents the amount charged by Midwest Trailer for the sale and titling of the trailers on the April 10, 2006 Highway Commercial-Zitis lease schedule. (*Id.*)

On May 5, 2006, the titles for the semi-trailers listed on the April 10, 2006 Highway-Zitis schedule were submitted to the Secretary of State with FreightStar listed as the owner. (Joint Stipulations ¶ 18.) The ST-556 Sales Tax Transaction forms dated April 14, 2006 bore the signature "Mike Zitas [sic]." (*Id.*)

At some point, Zitis used certain of the trailers Highway Commercial paid for in December 2009 as collateral for a loan he took out on FreightStar's behalf from Plaza Bank. (Zitis Dep. 82, 141.) Zitis testified that he did not recall having failed to make any payments, or having made only partial payments, owed to Highway Commercial at the time he secured the loan with Plaza Bank. (Zitis Dep. 143.) He also stated that he never told Highway Commercial about the loan with Plaza Bank. (*Id.*). He testified that the trailers were in "good condition" at the time they were pledged to Plaza Bank. (Zitis Dep. 145-46.)

John M. Jones, Jr., a representative of Plaza Bank, testified that after FreightStar defaulted on its loan, Plaza Bank repossessed the trailers and sold five of them to

partially satisfy FreightStar's debt. (Jones Dep. 28-29). Jones stated that he contacted twenty different trailer dealers regarding those trailers, and received only two offers for the trailers. (Jones Dep. 25-26.) Based on that response, he determined that holding a public auction for the trailers would be more expense than it was worth. (Jones Dep. 26-27.) Ultimately, Plaza Bank sold the five trailers to the highest bidder, for the "bulk" price of $49,000. (Jones Dep. 25-26, 33.) The precise timing of Zitis' pledge of the trailers, FreightStar's default, or Plaza Bank's repossession and sale of the trailers is not disclosed in the record before this Court.

At his deposition, Zitis testified that he did not have any conversations with Highway Commercial or Midwest Trailer at the time that Highway Commercial paid for the first batch of trailers in December 2005. (Zitis Dep. 118.) He also stated that "Highway Commercial was looking for titles months down the road," approximately "five, six months" "from the December '05 batch of trailers." (*Id.*) At that time, which would have been in approximately May or June 2006 according to Zitis' recollection, someone from Highway Commercial called FreightStar and told Gosia (full name unknown), FreightStar's safety director, that Highway Commercial "wants the trailers – the titles to the trailers." (Zitis Dep. 119.) Gosia relayed that request to Zitis, who said he told Gosia "Well, whatever we have, mail them to her – mail them to them." (*Id.*) Zitis stated that Gosia did not say who from Highway Commercial had called, and that he did not confirm or otherwise know whether Gosia had followed his instructions to mail the titles to Highway Commercial. (Zitis Dep. 119-20.)

At trial, Browning, Highway Commercial's President, testified that beginning in July or August of 2006, Zitis began having problems making payments under the Master

14

Lease Agreement.  (Tr. 46.)[7]  Browning testified that, given their past relationship, Highway Commercial was "lenient" with Zitis.  Among other things, Browning made a trip to Chicago and reviewed a business plan Zitis was pursuing with a new partner, and in November 2006, Highway Commercial closed all Zitis' existing leases, restructured the leases, and brought back some of Zitis' inventory to try to lower his payments and get his accounts receivable "caught up."  (Tr. 46-47.)

In September 2007, Byrd testified she had a conversation with Joshua Tannenbaum of Midwest Trailer, wherein she explained that Highway Commercial had still not received the titles to the trailers, and that Highway Commercial had reason to believe those titles were not in its name.  (Tr. 108.)  Byrd testified that Joshua Tannenbaum asked that she email the balances owed on the leases to Robert Tannenbaum, Midwest Trailer's President.  (*Id.*)  On September 10, 2007, Byrd's email to Robert Tannenbaum stated, among other things:

> Per my conversation today with Josh, I am sending the close out amounts on the 17 trailers we purchased from you for Mike Zitis/Freight Star Landlines.  I understand that it may be your intention to buy these units back, but I think you will see from the figures that these were not paid on hardly at all since the lease inceptions.  The problem we are facing is that we wired the money, $160k in Dec '05 & Apr '06, for these units and never received the titles.  We had contacted our attorney in filing suit to get the titles, however, Jeanette assured me that she is working with the IL title offices to get the titles corrected.  I have asked our attorney to hold off until Jeanette calls with confirmation that the titles were processed correctly, giving a new deadline of next Friday.

---

[7]  During cross-examination, while Browning indicated he had not recently looked through the payment history, and initially stated that "to the best of [his] knowledge," Zitis struggled throughout the term of the Master Lease to make payments, he then corrected himself, stating he believed Zitis "was current when we did the batch in April [2006] or we would not have done that."  (Tr. 63.)

(PX 10.)  Later that day, Robert Tannenbaum emailed Byrd that the issue had been taken care of and that the Secretary of State had confirmed receipt of the correct title applications. (Joint Stipulations ¶ 19; *see also* PX 10.)  For his part, Robert Tannenbaum testified at trial that, when he first learned of the titling issue, he told Byrd that he'd be willing to buy back the trailers, and that he may be able to get the titles changed.  (Tr. 199-200).  He testified that, at that time, he did not know that Zitis had allowed Plaza Bank to put a lien on some of the trailers.  (*Id.*)

On September 13, 2007, Midwest Trailer issued checks in payment of title correction fees to the Secretary of State for all seventeen trailers, the eight listed on the November 1, 2005 bill of sale and the nine listed on the April 10, 2006 lease schedule. (Joint Stipulations ¶ 20.)

On September 20, 2007, after having learned from the Illinois Secretary of State's Office that it required a letter from Midwest Trailer as to why it did not have the titles in its possession, and upon being unable to reach Jeanette at Midwest Trailer, Byrd again emailed Robert Tannenbaum.  (Tr. 110; PX 11.)  Tannenbaum replied "I understand it's been taken care of."  (PX 11.)

On October 10, 2007, Byrd sent a fax to the Illinois Secretary of State's Office. (PX 14.)  She testified she did so "to see if there was anything [she] could do to get these titles in our name – in Highway Commercial's name."  (Tr. 112.)  As a result of her communications with that Office, Byrd learned that seven trailers "had a lienholder already on the titles."  (Tr. 112.)  She also learned, from an individual named Joyce at that office, that the Illinois titles could not have listed Highway Commercial's Columbus, Ohio address, and that Highway Commercial could have its name, with Midwest

16

Trailer's address, on the titles.  (Tr. 113.)  Varela testified that Midwest Trailer would on occasion accommodate such out-of-state titling requests.  (Tr. 184-85.)  That form of titling was in fact done for those trailers leased to Zitis in April 2006 not subject to any lien by Plaza Bank, apparently after Robert Tannenbaum made a call to the Illinois Secretary of State's Office.  Specifically, those trailers' titles were changed to list Highway Commercial as owner and Fyda, Inc. as the first lienholder, both with Midwest Trailer's address.  (Tr. 113-114, 199-201; PX 15.)

The value of the trailers at the time of purchase was $19,950 each.  (Joint Stipulations ¶ 21.)  Certain of the mistitled trailers were recovered by Highway Commercial through the efforts of Midwest Trailer in re-titling, including all nine (9) of the trailers listed on the April 10, 2006 Highway-Zitis lease schedule, and one (1) of the trailers listed on the November 1, 2005 bill of sale.  (Joint Stipulations ¶ 22.)  Highway Commercial was able to obtain control over certain vehicles, all of which were listed on the April 10, 2006 lease schedule, and sell them.  (*Id.*)  Browning, Highway Commercial's President, testified that Highway Commercial did some nominal work on those trailers after they were repossessed, to ensure they were "DOT sound," that is, that the tires were "good" and the trailers had "no safety issues."  (Tr. 53.)  Fyda sold several of those recovered trailers on Highway Commercial's behalf on Fyda's retail sales lot for $17,500 each.  (PX 16; Tr. 51-54.)   Fyda sold those trailers to Stover Transportation, Inc. ("Stover"), an existing customer of Fyda's, in late 2007 and in 2008.  (PX 16; Tr. 50.)  Browning stated that the sale was a "normal business transaction" and confirmed that the terms of sale were nothing other than an arm's length commercial transaction.  (Tr. 52.)  Browning testified that in his experience, one 53-foot dry trailer

17

does not differ substantially from another. (Tr. 55-56.)

Robert Tannenbaum, Midwest Trailer's President, testified that the initial depreciation of a new trailer immediately after it is sold is approximately twenty-five percent. (Tr. 204.) He stated that in December 2005, when Highway Commercial paid for the eight trailers at issue in this case, those trailers were not new but used, because Midwest Trailer had purchased them new and leased them to Zitis beginning in April 2005. (Tr. 216, 225.) He also testified that the industry applies a "ten-year" rule to determine the useful life of a trailer. (Tr. 191.) As a result, he stated that normally, he would not pay more than $16,500 or $17,000 to purchase a trailer that was several months old. (Tr. 218.) However, he later testified that Midwest Trailer charged Zitis a new vehicle price for those trailers in December 2005 because Midwest Trailer was attempting to make up the loss incurred from Zitis' failure to make his trailer rental payments. (Tr. 222-23.)

Robert Tannenbaum testified at trial that the trailer market in 2006 was "pretty good," in part due to Hurricane Katrina and people "getting paid a fortune just to haul garbage." (Tr. 226; *see also* Zitis Dep. 26-27.) However, Tannenbaum stated that in 2007, there would have been "zero chance" that any trailer dealer would have paid $17,500 for a two- to four-year old trailer in fair to poor condition where that trailer's original price had been $19,500.[8] (Tr. 204-206.) He based that conclusion on his estimate of the cost to refurbish the trailer and the "bad" market for trailers at that time.

---

[8] The $19,500 amount appears to be a immaterial misstatement, as the bill of sale included in Varela's December 9, 2005 facsimile to Byrd sets forth a per trailer purchase price of $19,950, and the parties stipulate that the value of each trailer at the time of purchase was $19,950. (PX 5; Joint Stipulations ¶ 21.)

(Tr. 204-206.)  Finally, he testified that he thought the amount Plaza Bank received for the five trailers it repossessed and sold – which Jones testified was $49,000 – was "reasonable."[9]  (Tr. 206.)

## II.  CONCLUSIONS OF LAW

This action includes three counts: breach of contract (Count Two); breach of duty by bailee (Count Three); and breach of fiduciary duty (Count One).  (Compl. at 3-4 [1].)

The Court has diversity jurisdiction over all counts.  28 U.S.C. § 1332(a)(1). Section 1332(a)(1) provides federal courts with jurisdiction over all civil cases where the matter in controversy is in excess of $75,000 exclusive of interest and costs and is between citizens of different states.  In this case, both requirements are satisfied. Venue is proper in this district under 28 U.S.C. § 1391(a) because this is a civil action founded on diversity jurisdiction and defendant is an Illinois corporation with its principal place of business located in Chicago, Cook County, Illinois. The parties stipulate that the jurisdiction of this Court is proper.  (Final Pretrial Order.)  Further, the parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1) [84].

_____

[9]  Defense counsel represented at trial, during his questioning of Robert Tannenbaum, that the amount Plaza Bank received for those trailers was $49,500.  (Tr. 206.)  However, this Court is unable to find any evidence supporting that precise amount in the record before it.  Instead, we conclude, in accordance with Jones' deposition testimony, that Plaza Bank received $49,000 for the trailers it sold.  (Jones Dep. 25-26.)  We note that the discrepancy makes no difference for purposes of this Court's analysis.

## A.     Breach of Contract (Count Two)

In Illinois, the elements of a breach of contract claim are (1) an offer and acceptance; (2) consideration; (3) definite and certain contractual terms; (4) the plaintiff's performance of all required contractual conditions; (5) the defendant's breach of the contractual terms; and (6) damage resulting from the breach.  *E.g., Green v. Trinity Int'l Univ.*, 344 Ill. App. 3d 1079, 1085 (2d Dist. 2003).  These elements are all present here.  The final element of damages will be addressed separately, at subsection D below.

The evidence establishes that the parties agreed that Highway Commercial would purchase trailers from Midwest Trailer for the use of Zitis/FreightStar.  Midwest Trailer and Zitis had a prior relationship wherein Zitis leased trailers from Midwest Trailer.  Midwest Trailer knew that Zitis wanted to purchase those trailers, and they agreed on the price Zitis would pay for each trailer.  Additionally, Midwest Trailer knew Zitis was working to obtain the financing needed to purchase the trailers.  Indeed, Midwest Trailer assisted Zitis in those financing efforts on at least one occasion prior to Highway Commercial providing that financing, by faxing a purchase order to Balboa, a financing company located in Arizona.

Given that context, Byrd's December 9, 2005 call to Midwest Trailer, Valera's subsequent facsimile to Byrd, and Byrd's December 9, 2005 email to Valera, met the necessary requirements for the formation of a binding contract under Illinois law.  As per Byrd's email, that contract required Midwest Trailer to title the trailers in Highway Commercial's name.  Highway Commercial performed all of its obligations under the parties' contract when it wire transferred the contract purchase price to Midwest Trailer

20

on December 20, 2005.  Midwest Trailer did not perform all of its obligations, as it failed

to title the trailers in Highway Commercial's name.  While there may be various

explanations for that failure – Valera now claims not to have received Byrd's December

9 email with titling instructions; Valera left the company shortly afterward; Joshua

Tannenbaum denies having seen Byrd's January 14 email asking about titling;

Gradford, upon replacing Valera, may have dropped the ball or been persuaded by Zitis

to title the trailers in his name – none of those explanations relieve Midwest Trailer of its

responsibility for breaching this aspect of the contract.[10]  That breach occurred in March

2006, at the time Midwest Trailer submitted titles to the trailers at issue to the Illinois

Secretary of State's Office in FreightStar's name.

We reject Midwest Trailer's varied – and eleventh-hour – arguments that no

contract between it and Highway Commercial exists.  As for Byrd and Valera's authority,

the evidence establishes that both acted consistently with the belief that their

supervisors had already approved the transaction, and demonstrates that Midwest

Trailer never attempted to disavow the transaction until this litigation.  As for Midwest

Trailer's invocation of Illinois' Statute of Frauds, 810 ILCS 5/2-201, putting aside

Valera's acknowledgment at trial that she sent the fax, and the appearance of her

(typed) signature upon it, the statute requires a "writing sufficient to indicate that a

---

[10]  Notably, we do not credit Valera's testimony that she did not recall receiving Byrd's
December 9 email.  Valera's distinctive spelling of her first name lends credence to Byrd's
testimony that she contacted Valera for her correct email address.  The evidence clearly
establishes that Valera provided Byrd with her correct email address, and that Byrd sent Valera
titling instructions at that address.  The consequences of Valera apparently not having checked
or otherwise being unfamiliar with her email account is properly born by her employer, not
Highway Commercial.

contract for sale has been made," not necessarily a final written expression. 810 ILCS 5/2-201(1). Further, a failure to meet the requirements under subsection (1) of the statute is excused "with respect to goods for which payment has been made and accepted or which have been received and accepted." 810 ILCS 5/2-201(3)(c). As the District Court previously noted, "it is well settled that, where a contract has been performed by a complainant, the statute of frauds cannot be interposed as a defense to his bill for appropriate relief." (Order dated 1/26/09 at 3 [36] (*quoting Butcher v. United Elec. Coal Co.*, 174 F.2d 1003, 1007 (7th Cir. 1949) (quotation omitted)).) Indeed, "[u]nder Illinois law, it is well settled that full performance by one party to an oral contract renders the bar of the statute of frauds inapplicable." *Brooks v. Eder*, No. 85 C 6909, 1986 WL 413, at *3 (N.D. Ill. Oct. 3, 1986). The evidence establishes that Highway Commercial fully performed its side of the contract by wire transferring payment for the trailers to Midwest Trailer, which effectively takes the contract outside of the statute of frauds requirements. We will not condone Midwest Trailer's attempt to use the statute to repudiate a contract that it in fact made. *Roboserve, Inc. v. Kata Kaguko Co.*, 873 F. Supp. 1124, 1131 (N.D. Ill. 1995) (*aff'd in part, vacated in part*, *on other grounds,* 78 F.3d 266 (7th Cir. 1996)) (*citing Poulos v. Reda*, 165 Ill. App. 3d 793, 801 (1st Dist. 1987)).

Finally, we reject Midwest Trailer's argument that to the extent any contract existed, it is illegal and unenforceable. First, we note that several witnesses – including Midwest Trailer's – testified that if the Illinois Secretary of State's Office would not accept an out-of-state address on a title, Midwest Trailer could have used its own address on the title, along with the appropriate owner's name. In fact, that is precisely

what Midwest Trailer ended up doing in late 2007 to correct the titles for those trailers not subject to a Plaza Bank lien.  Second, several witnesses – again including Midwest Trailer's – testified that Midwest Trailer could have endorsed the titles and sent them to Highway Commercial for it to file with the Secretary of State's Office.  Midwest Trailer did neither with respect to the trailers at issue.  Finally, we do not, and need not, decide whether the requirement that Midwest Trailer list Highway Commercial on the title is illegal in and of itself.  As stated in *K. Miller Constr. Co. v. McGinnis*, 238 Ill.2d 284, 294 (2010), "the fact that there has been a statutory violation does not, in itself, automatically render a contract unenforceable."  Instead, the statutory violation embodied in the contract must be, among other things, "seriously injurious to the public order."  *Id.* at 295 (citation omitted).  Midwest Trailer has not established that the contract at issue here so qualifies.

## B.      Breach of Duty by Bailee (Count Three)

Under Illinois law, a bailment constitutes the delivery of personal property "for the accomplishment of some purpose, upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with according to his directions or kept until he reclaims it."  *Loman v. Freeman*, 229 Ill.2d 104, 131 (2008).  To prevail on a bailment claim, a plaintiff must show: (1) an express or implied agreement to create a bailment; (2) delivery of the property in good condition; (3) acceptance of the property by the bailee; and (4) the bailee's failure to return the property, or the return of the property in damaged condition.  *E.g.*, *Indemnity Ins. Co. of No. Am. v. Hanjin Shipping Co.*, 348 F.3d 628, 637 (7th Cir. 2003).

Much of the same evidence proving Highway Commercial's claim for breach of contract also establishes that Midwest Trailer breached its duty of bailment. As set forth above, Highway Commercial has proven the existence of a contract, as well as its property right in the titles to the trailers. Highway Commercial has established that, as part of the agreement it entered into with Midwest Trailer, it agreed to pay the purchase price of the trailers in exchange for Midwest Trailer's promise to put the title of those trailers in Highway Commercial's name. Highway Commercial has also proven that Midwest Trailer failed to transfer the titles to the trailers purchased by Highway Commercial. Essentially, upon receipt of the wire transfer on December 20, 2005, Midwest Trailer no longer possessed its own property with respect to the trailer titles, but was in possession of Highway Commercial's property. Thereafter, Midwest Trailer breached its duty of bailment by failing to exercise proper diligence and care when it titled the trailers in FreightStar's name and sent them to Zitis.

We reject Midwest Trailer's argument that the fact that Highway Commercial never physically possessed the titles for the trailers at issue, and thus never gave them to Midwest Trailer, somehow defeats Highway Commercial's bailment claim. (Df's Resp. at 5 [102].) Midwest Trailer has cited no case law that so narrowly construes the "delivery" requirement for a bailment claim. *Cf.* 19 Williston on Contracts § 53:1 (4th ed.) ("In most bailments ... the goods have either been delivered by the bailor to the bailee, *or have been retained by the bailee, as where a seller continues in possession*, under some agreement expressed or implied in fact.") (emphasis supplied).

Because Highway Commercial makes no distinction between the damages it asserts for breach of contract and those it asserts for breach of duty by bailee, the

element of damages will be addressed, in conjunction with both those claims, at subsection D below.

### C.    Breach of Fiduciary Duty (Count One)

Under Illinois law, a plaintiff may recover for breach of fiduciary duty where: (1) a fiduciary duty exists on defendant's part; (2) the defendant breached that fiduciary duty; and (3) damages proximately resulted from the breach. *Romanek v. Connelly*, 324 Ill. App. 3d 393, 404 (1st Dist. 2001). A fiduciary duty may arise as a matter of law from the existence of a particular relationship, such as an attorney-client or principal-agent relationship. *See Ransom v. A.B. Dick, Co.*, 289 Ill. App. 3d 663, 672 (1st Dist. 1997). When the relationship between the parties is not one that gives rise to a fiduciary relationship as a matter of law, the party asserting the existence of the relationship has the burden of establishing such by clear and convincing evidence. *Id.*

It is well established under Illinois law that parties to a contract do not owe a fiduciary duty to one another. *E.g.*, *Prescott v. Allstate Life Ins. Co.*, 341 F. Supp. 2d 1023, 1028 (N.D. Ill. 2004); *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir.1992)). However, there are some circumstances where a fiduciary relationship develops between contracting parties. *Prescott*, 341 F. Supp. 2d at 1028. Factors suggesting a fiduciary relationship include "the degree of business experience between the parties," *Oil Express Nat'l, Inc. v. Latos*, 966 F.Supp. 650, 651 (N.D. Ill.1997), and the "extent to which the allegedly subservient party entrusts the handling of his business and financial affairs to the other." *In re Estate of Wernick*, 151 Ill. App. 3d 234, 244 (1st Dist. 1986). To establish such a duty, one party to a contract must prove that it is "heavily dependent upon the advice" of

the other. *Prescott*, 341 F. Supp. 2d at 1028 (citations omitted). "[M]ere allegations that one businessman simply trusted another to fulfill his contractual obligations is certainly not enough" to establish a fiduciary relationship. *Carey Elec. Contracting, Inc. v. First Nat'l Bank of Elgin*, 74 Ill. App. 3d 233, 238 (2d Dist. 1979).

Here, the evidence does not establish that Highway Commercial's dealings with Midwest Trailer were anything other than arms-length, or that Midwest Trailer played an advisory role with respect to Highway Commercial's business activities. Because Highway Commercial has proven nothing beyond normal contractual expectations vis a vis Midwest Trailer, its state-law breach of fiduciary duty claim fails.

### D. Damages

Under Illinois law, "[t]he measure of damages for breach of contract is the amount which will compensate the injured party for the loss which either fulfillment of the contract would have prevented or which the breach of it has entailed." *Harden v. Playboy Enters., Inc.*, 261 Ill. App. 3d 443, 453 (1st Dist. 1993). "The purpose of damages is to put the nonbreaching party into the position he or she would have been in had the contract been performed, but, not in a better position." *Id.* at 454. The measure of damages for breach of a bailment under Illinois law is the value of the property at the time of its demand or loss. *Cushman v. Hayes*, 46 Ill. 145, 1867 WL 5348, at *7 (Sept. Term 1867) (the proper measure of damages for breach of a contract of bailment is "the value of the property converted, at the time of the demand"); *Winfield Design Assocs., Inc. v. Quincy Jefferson Venture*, 581 F. Supp. 21, 22-23 (N.D. Ill. 1984) (bailee's "damages are to be measured by the fair market value of the goods immediately before their destruction, less any salvage value"); *Mueller v. Soffer*, 160 Ill.

App. 3d 699, 706-707 (5th Dist. 1987) (where property subject to bailment contract was "effectively destroyed, plaintiffs' damages may be measured by the value of the carts at the time of their destruction").

Highway Commercial seeks damages for the loss of seven of the eight trailers it paid for in December 2005, "plus the titling fees that Midwest collected but did not earn." (Pl's Post-Trial Br. at 14 [99].) As noted above, Highway Commercial asserts the same type and amount of damages with respect to each of its claims. Further, the facts of this case warrant no distinction between damages for breach of contract and breach of bailment. As a result, we will consider the damages element for both claims in tandem.

Highway Commercial first contends that because Midwest Trailer breached at the time it submitted the titles to the Secretary of State's Office, and it did so "shortly after [the trailers] were purchased," the trailers "were a complete loss," and thus Highway Commercial is entitled to recover the "purchase valuation" of each trailer at that time, $19,950 each. (*Id.* 13; Pl's Resp. at 13 n.1 [104].)[11] Highway Commercial alternatively argues that if the measure of damages is the value of the trailers had they been recovered and sold by it, it is entitled to $17,500 per trailer. (*Id.* 14.) That is the per trailer price at which Fyda sold several of the recovered trailers from the April 2006 batch to Stover in 2007 and 2008. (PX 16; Tr. 50-54.)

We conclude that neither per trailer price proffered by Highway Commercial is the appropriate measure of its damages in this case. At the time it paid for the trailers

---

[11] Confusingly, Highway Commercial incorrectly calculates the total it seeks for the seven trailers as $136,500. (Pl's Resp. at 14.) That total would assume a per trailer price of $19,500, a price that Highway Commercial elsewhere notes is not correct. (*Id.* at 13 n.1.)

at issue, those trailers had been used by Zitis/FreightStar for several months, and Highway Commercial showed no indication of wanting to possess them in the near future. We find that the appropriate measure of damages is the value of those trailers in early to mid-2006. At that time, Midwest Trailer breached by delivering the titles in FreightStar's name to the Secretary of State's Office, FreightStar began having problems making payments to Highway Commercial, Highway Commercial first contacted FreightStar directly seeking the titles to those trailers, and Zitis pledged those trailers to Plaza Bank. Based on the testimony of Robert Tannenbaum regarding, among other things, trailer depreciation and market conditions, as well as Zitis' testimony regarding the condition of those trailers at that time, we conclude that a per trailer price of $14,962.50 (75% of $19,950), or $104,737.50 for all seven trailers, would have been reasonable for Highway Commercial to obtain had it sold the trailers at that time.

We do not agree with Midwest Trailer that had Highway Commercial "exercised any diligence, it could have avoided its entire loss ...." (Df's Post-Trial Br. at 97.) Highway Commercial contacted Midwest Trailer repeatedly in December 2005, January 2006, and February 2006, to determine whether Midwest Trailer had appropriately titled the trailers. Given its explicit instructions to Midwest Trailer that the titles be in Highway Commercial's name, Highway Commercial had no reason to suspect otherwise until FreightStar fell behind in its payments under the Master Lease and Highway Commercial requested – but did not receive – the titles from FreightStar. At that point, the trailers had already been pledged to Plaza Bank. While hindsight is 20/20, Midwest Trailer has not established that its examples of mitigation would have been of any use

at the time of breach or thereafter.

As for titling fees, we conclude that Highway Commercial is entitled to recover the fees Midwest Trailer charged it for each of the seven trailers. The evidence shows that Highway Commercial paid $920 for titling fees for the eight trailers in December 2005. As a result, the per trailer titling fee charged appears to have been $115, or $805 for the seven trailers Highway Commercial never recovered.[12]

In sum, we find that Highway Commercial was damaged in the amount of, and is entitled to recover from Midwest Commercial, a total of $105,542.50 for the loss of the seven trailers Highway Commercial paid for in December 2005. Our conclusion necessarily requires denial of Midwest Trailer's oral motion for directed verdict (Tr. 189), wherein counsel argued that Highway Commercial had failed to establish a sufficient level of damages to meet the jurisdictional requirements of 28 U.S.C. § 1332.

---

[12] Unfortunately, Highway Commercial's written submissions to this Court do not correctly specify the amount of titling fees to which it is entitled. In various places, Highway Commercial appears to be seeking the entire $920 in fees it paid for all eight trailers, notwithstanding the fact that it seeks damages for the loss of only seven of those trailers. (*E.g.*, Pl's Resp. at 14.) Elsewhere, Highway Commercial indicates it seeks $942 for titling fees (*see* Final Pretrial Order), but it provided no evidentiary support for that amount at trial.

## III. CONCLUSION

For the foregoing reasons, the Court finds in favor of Highway Commercial on its claims for breach of contract (Count Two) and breach of duty by bailee (Count Three), and awards it damages in the amount of $105,542.50.  We find in favor of Midwest Trailer on Highway Commercial's breach of fiduciary duty claim (Count One).  Pursuant to Fed. R. Civ. P. 54(d), Highway Commercial, as the prevailing party, is entitled to recover its court costs against Midwest Trailer.  Highway Commercial shall file its bill of costs by 6/6/11, and Midwest Trailer shall file any objections thereto by 6/20/11.  Midwest Trailer's oral motion for directed verdict (Tr. 189) is denied.  The Court will enter judgment after determining the amount of Highway Commercial's costs.

It is so ordered.

ENTERED:

_____
MICHAEL T. MASON
United States Magistrate Judge

Dated: May 16, 2011